**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

UNILOC USA, INC. and UNILOC
LUXEMBOURG, S.A.,

        Plaintiffs,

    v.

AUTODESK, INC.

        Defendant.

Case No. 2:15-cv-1187-JRG-RSP

## MEMORANDUM OPINION AND ORDER

      Before the Court is the opening claim construction brief of Uniloc USA, Inc. and Uniloc Luxembourg S.A. (collectively, "Plaintiffs") (Dkt. No. 44, filed on April 12, 2016),[1] the response of Autodesk, Inc. ("Defendant") (Dkt. No. 48, filed on April 26, 2016), and the reply of Plaintiffs (Dkt. No. 50, filed on May 3, 2016). The Court held a hearing on the issues of claim construction and claim definiteness on May 24, 2016. Having considered the arguments and evidence presented by the parties at the hearing and in their briefing, having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Memorandum Opinion and Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

---

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

**Table of Contents**

I.      BACKGROUND ........................................................................... 3

II.    LEGAL PRINCIPLES ................................................................ 4

     A.      Claim Construction ........................................................ 4

     B.      Departing from the Ordinary Meaning of a Claim Term................................ 7

     C.      Functional Claiming and 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA) ................................................. 8

     D.      Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA) ........... 10

III.   CONSTRUCTION OF AGREED TERMS ................................. 11

IV.   CONSTRUCTION OF DISPUTED TERMS ............................. 12

     A.      The Add-On Terms ...................................................... 12

     B.      "price schedule" .......................................................... 20

     C.      "parametric symbol" .................................................... 24

     D.      "inserting the price schedule into the construction plan file" ........................ 27

     E.      "[may/can] be immediately used on the local computer to place an order to purchase one or more construction plan elements that are present in the price schedule" .......................... 32

     F.      The Alleged 35 U.S.C. § 112, ¶ 6 Terms ..................................... 35

V.     CONCLUSION ........................................................................ 40

# I. BACKGROUND

Plaintiff alleges infringement of U.S. Patents No. 7,783,523 (the "'523 Patent") and No. 8,515,820 (the "'820 Patent") (collectively, the "Asserted Patents"). The '523 Patent is entitled "Automated Pricing System." The application leading to the '523 Patent was filed on December 20, 2007 and the patent issued on August 24, 2010. The '820 Patent is also entitled "Automated Pricing System." The application leading to the '820 Patent was filed on August 16, 2012 and the patent issued on August 20, 2013. The '820 Patent's application is a continuation of an application that is itself a continuation-in-part of the '523 Patent's application. Both patents claim priority to an application filed on January 17, 2003.

In general, the Asserted Patents are directed to systems and methods by which pricing information for elements in a construction plan may be automatically generated by an add-on code (or plug-in) to a CAD program or other software design tool.

The abstract of the '523 Patent provides:

> A method and system for a rapid and automated creation of a price schedule comprising steps and an implementation for providing a set of construction plans created with an architectural software design tool, such as CAD, and a palette of 2-dimensional and/or 3-dimensional architectural parametric symbols that correspond to respective construction plan elements, such as windows, doors, acrylic glass blocks and/or sky lights. At least one parametric symbol corresponding to a construction plan element is inserted into the construction plans. A cost value for each of the inserted parametric symbols is calculated corresponding to respective plan elements. A price schedule is then created which includes the total cost for all of the inserted parametric symbols corresponding to respective plan elements.

The abstract of the '820 Patent provides:

> The present invention comprises a method and system for a rapid and automated creation of a price schedule comprising steps and an implementation for providing a set of construction (or other) plans created with an architectural, civil, industrial or other software design tool, such as CAD, and optionally a palette of 2-dimensional and/or 3-dimensional architectural parametric symbols that correspond to respective construction plan elements, such as windows, doors, acrylic glass blocks and/or sky lights. At least one parametric symbol

corresponding to a construction plan element is preferably inserted into the construction plans. A cost value for each of the inserted parametric symbols is preferably calculated corresponding to respective plan elements. A price schedule is then optionally created which includes the total cost for all of the inserted parametric symbols corresponding to respective plan elements.

## II.    LEGAL PRINCIPLES

### A.    Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362,

1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415

F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court recently explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

**B.  Departing from the Ordinary Meaning of a Claim Term**

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.") "Where an applicant's statements are

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

Although a statement of lexicography or disavowal must be exacting and clear, it need not be "explicit." *See Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016) ("a patent applicant need not expressly state 'my invention does not include X' to indicate his exclusion of X from the scope of his patent"). Lexicography or disavowal can be implied where, *e.g.*, the patentee makes clear statements characterizing the scope and purpose of the invention. *See On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope."). Nonetheless, the plain meaning governs "[a]bsent implied or explicit lexicography or disavowal." *Trs. of Columbia Univ.*, 811 F.3d at 1364 n.2.

## C.    Functional Claiming and 35 U.S.C. § 112, ¶ 6 (pre-AIA) / § 112(f) (AIA) [3]

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112, ¶ 6; *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in relevant portion). Section 112, Paragraph 6, provides that a structure may be claimed as a "means . . . for performing a specified function" and that an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002).

But § 112, ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112, ¶ 6 applies when the claim language includes "means" or "step for" terms, and that it does not apply in the absence of those terms. *Masco Corp.*, 303 F.3d at 1326; *Williamson*, 792 F.3d at 1348. The presumption stands or falls according to whether one of

---

[3] Because the applications resulting in the Asserted Patents were filed before September 16, 2012, the effective date of the America Invents Act ("AIA"), the Court refers to the pre-AIA version of § 112.

ordinary skill in the art would understand the claim with the functional language, in the context of the entire specification, to denote sufficiently definite structure or acts for performing the function. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (§ 112, ¶ 6 does not apply when "the claim language, read in light of the specification, recites sufficiently definite structure" (quotation marks omitted) (citing *Williamson*, 792 F.3d at 1349; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014))); *Williamson*, 792 F.3d at 1349 (§ 112, ¶ 6 does not apply when "the words of the claim are understood by persons of ordinary skill in the art to have sufficiently definite meaning as the name for structure"); *Masco Corp.*, 303 F.3d at 1326 (§ 112, ¶ 6 does not apply when the claim includes an "act" corresponding to "how the function is performed"); *Personalized Media Communications, L.L.C. v. International Trade Commission*, 161 F.3d 696, 704 (Fed. Cir. 1998) (§ 112, ¶ 6 does not apply when the claim includes "sufficient structure, material, or acts within the claim itself to perform entirely the recited function . . . even if the claim uses the term 'means.'" (quotation marks and citation omitted)).

When it applies, § 112, ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347. Construing a means-plus-function limitation involves multiple steps. "The first step . . . is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "[T]he next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* The focus of the "corresponding

structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.* The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). However, § 112 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

For § 112, ¶ 6 limitations implemented by a programmed general purpose computer or microprocessor, the corresponding structure described in the patent specification must include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). The corresponding structure is not a general purpose computer but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### D.     Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA) [4]

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 2124. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 2130. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *Id.* at

---

[4] Because the applications resulting in the Asserted Patents were filed before September 16, 2012, the effective date of the America Invents Act ("AIA"), the Court refers to the pre-AIA version of § 112.

2130 n.10. "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "the court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005); *accord Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (citing *Datamize*, 417 F.3d at 1351).

In the context of a claim governed by 35 U.S.C. § 112, ¶ 6, the claim is invalid as indefinite if the claim fails to disclose adequate corresponding structure to perform the claimed functions. *Williamson*, 792 F.3d at 1351–52. The disclosure is inadequate when one of ordinary skill in the art "would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim." *Id*. at 1352.

## III.    CONSTRUCTION OF AGREED TERMS

The parties have agreed to the following constructions set forth in their P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 52):

| Term[5] | Agreed Construction |
|---|---|
| "construction"<br><br>• '523 Patent Claims 45, 46<br>• '820 Patent Claims 1, 4, 7, 13, 16, 19 | plain and ordinary meaning |

---

[5] For all term charts in this order, the claims in which the term is found are listed with the term but: (1) only the highest level claim in each dependency chain is listed, and (2) only asserted claims identified in the parties' P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 52) are listed.

| Term[5] | Agreed Construction |
|---|---|
| "price" <br><br> • '523 Patent Claims 45, 46 <br> • '820 Patent Claims 1, 4, 7, 13, 16, 19 <br><br> "current pricing data" <br><br> • '820 Patent Claims 1, 16 | "actual cost—not an estimate—at which a material, good, item or product is procured or obtained, typically as a result of a purchaser purchasing the same from a seller" |
| "reference number" <br><br> • '523 Patent Claims 51, 52 | plain and ordinary meaning |

## IV.    CONSTRUCTION OF DISPUTED TERMS

The parties' positions and the Court's analysis as to the disputed terms are presented

below.

### A.    The Add-On Terms

| Disputed Term | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "add-on computer software code" <br><br> • '523 Patent Claims 45, 46 <br> • '820 Patent Claims 1, 4, 7, 13, 16, 19 | Plain and ordinary meaning, an example of which is set forth in the patent specification for the '820 Patent. No construction necessary. | "set of computer code that cannot be run independently from the software design tool" <br><br> Alternatively, indefinite under 35 U.S.C. § 112, ¶ 2. |
| "add-on computer software code that runs . . . as an internal component within [a/the architectural] software design tool" <br><br> • '523 Patent Claims 45, 46 <br> • '820 Patent Claims 1, 4, 7, 13, 16, 19 | Plain and ordinary meaning, an example of which is set forth in the patent specification for the '820 Patent. No construction necessary. | "set of computer code that cannot be run independently from the software design tool and at least a portion of which runs within the same operating system process as a software design tool" <br><br> Alternatively, indefinite under 35 U.S.C. § 112, ¶ 2. |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

### The Parties' Positions

Plaintiffs submit that construction of "add-on computer software code" is unnecessary and that the term should be accorded its plain and ordinary meaning. (Dkt. No. 44 at 13–14). Plaintiffs argue that Defendant's proposed construction improperly injects the limitation that the add-on computer software code "cannot be run independently from the software design tool." (*Id.* at 14). According to Plaintiffs, this contradicts the express teaching of the '820 Patent which states that "the plug-in [add-on] computer code may run outside of the software design tool." (*Id.*) (quoting '820 Patent col.61 ll.48-49 (modification by Plaintiffs)). Plaintiffs further argue that the add-on computer software code does not necessarily require that "at least of portion of [the code] runs within the same operating system process as a software design tool." (*Id.* at 14–15). According to Plaintiffs, such a limitation is entirely foreign to the Asserted Patents. (*Id.*).

Plaintiffs further submit that the meaning of "add-on computer software code" is sufficiently definite in light of the Asserted Patents' description of the term. (*Id.* at 15–16). Specifically, Plaintiffs submit that the Asserted Patents describe that:

> The plug-in (add-on) computer software code is a set of computer code that is designed to run within a parent computer software application or code, particularly architectural CAD software (or another architectural, civil, industrial or other software design tool), as an internal component, i.e., it "adds on" to the parent software application. Alternatively, the plug-in computer code may run outside of the software design tool operating as a dynamic link library, executable (.exe), ActiveX, COM object, or combination thereof; and/or the like.

(*Id.* at 16 & n.8) (citing '523 Patent col.17 ll.53–58; '820 Patent col.61 ll.42–47).

In addition to the claims themselves, Plaintiffs cite the following **intrinsic evidence** to support their position: '523 Patent col.17 ll.53–58; '820 Patent col.54 ll.32–43, col.61 ll.42–49.

Defendant responds that the term to be construed is "add-on computer software code that runs . . . as an internal component within [a/the architectural] software design tool." (Dkt. No. 48 at 11–12). Specifically, Defendant contends that every asserted claim expressly states that the add-on computer software code may not run outside of the software design tool in that each states that it runs "***as an internal component within***" the tool. (*Id*. at 12–13) (emphasis added by Defendant). Defendant further responds that the claims in the application that led to the '820 Patent originally included that the add-on software code could run either "as an internal component within the software design tool" or "outside of the software design tool," but that the applicant removed the "outside the software design tool" from the claims in a preliminary amendment. (*Id*. at 13). And, Defendant contends, the '820 Patent issued because that prior-art did not disclose "an add-on computer software code that runs as an ***internal component*** within a software design tool on the computer." (*Id*. at 13–14) (quoting '820 Patent File Wrapper July 1, 2013 Notice of Allowability at 4, Dkt. No. 48-7 at 5 (emphasis added by Defendant)).

Defendant further responds that "add-on computer software code" that runs independently of the software design tool was disclaimed. (*Id*. at 14). Specifically, Defendant argues that the add-on computer software code that runs as an internal component within a software design tool was expressly distinguished from stand-alone programs that run independently of the software design tool, both in the disclosures of the Asserted Patents and in the prosecution history. (*Id*. at 14–15). For example, Defendant cites column 8, lines 7 through 12 of the '820 Patent, which state:

> In contrast with embodiments within the methods and systems of the present invention, the decorating system of Schuller et al.: (1) does not employ a plug-in (add-on) computer software code that runs as an internal component within a software design tool on a local computer, such as architectural CAD but, rather, uses a stand alone computer program.

(*Id*. at 14). And Defendant notes that the inventors/applicants argued this distinction in prosecuting the application that led to the '523 Patent. (*Id*. at 14–16). For example, the applicants stated that "if a CAD program is ***not*** required in the invention described by Smith, Smith could not possibly employ an add-on computer software code that runs as an internal component within an architectural software design tool." (*Id*. at 14–15) (quoting '523 Patent File Wrapper Feb. 9, 2010 Amendment and Response at 45–46, Dkt. No. 48-9 at 46–47 (emphasis in original)). Defendant further contends that the plain meanings of "add-on" and "plug-in," as set forth in extrinsic evidence, do not support that the "add-on computer software code" runs independently of the software design tool. (*Id*. at 15).

Defendant further responds that the add-on computer software code that runs as an internal component of a software design tool necessarily "runs within the same operating system process as a software design tool." (*Id*. at 15–16). According to Defendant, this is clear from the prosecution history and the disclosures of the Asserted Patents. (*Id*.). For example, the applicants/inventors argued that the invention "performs one or more sets of operations ***in*** a software design tool . . . ***using the add-on***." (*Id*. at 16) (quoting '523 Patent File Wrapper Feb. 9, 2010 Amendment and Response at 27, Dkt. No.48-9 at 28 (emphasis added by Defendant)). And the Asserted Patents provide that "a merge module can put or insert the computer add-on code ***into the software design program***" when the add-on code is running inside the CAD program. (*Id*.) (quoting '820 Patent col.58 ll.39–45 (emphasis added by Defendant)).

Defendant also responds that if the "add-on computer software code" is construed to include code that can run independently of the software design program, then all the asserted claims are indefinite as contrary to the disclosures of the invention in the Asserted Patents. (*Id*. at 16–17) (citing *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002)).

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position. **Intrinsic evidence**: '523 Patent col.2 l.60 – col.3 l.2, col.4 ll.25–30, col.6 l.67 – col.7 l.11, col.7 ll.60–65, col.17 ll.53–59; '820 Patent col.2 ll.57–67, col.4 l.27–32, col.7 ll.12–23, col.8 ll.7–12, col.58 ll.39–45, col.61 ll.42–51; '523 Patent File Wrapper Dec. 24, 2009 Office Action (Defendant's Ex. G, Dkt. No. 48-8), Feb. 9, 2010 Amendment and Response (Defendant's Ex. H, Dkt. No. 48-9); '820 Patent File Wrapper Aug. 16, 2012 Application (excerpts) (Defendant's Ex. D, Dkt. No. 48-5), Oct. 29, 2012 Preliminary Amendment (Defendant's Ex. E, Dkt. No. 48-6), July 1, 2013 Notice of Allowability (Defendant's Ex. F, Dkt. No. 48-7). **Extrinsic evidence**: Declaration of Dr. Philip Greespun on Claim Construction Issues ("Greenspun Decl.") (Defendant's Ex. I, Dkt. No. 48-10); Wikipedia, "Add-on," available at https://en.wikipedia.org/wiki/Add-on (Defendant's Ex. J, Dkt. No. 48-11); Douglas Downing, et al., *Dictionary of Computer and Internet Terms* (8th ed. 2003), "plug-in" (Defendant's Ex. K, Dkt. No. 48-12); *Microsoft Computer Dictionary* (5th ed. 2002), "add-on" and "plug-in" (Defendant's Ex. L, Dkt. No. 48-13);

Plaintiffs reply that the claims are silent as to whether the add-on computer software code can run independently of the software design tool, they simply require that the code can run as in internal component of the software design tool. (Dkt. No. 50 at 2). Plaintiffs further reply that nothing in the intrinsic record supports reading in the limitation that at least a portion of the add-on computer software code "runs within the same operating system process as a software design tool." (*Id*. at 3). And Plaintiffs further reply that the statements distinguishing the add-on computer software code from a stand-alone program do not constitute disclaimer of code that can run outside of the software design tool, but, rather, the statements clarified that the add-on was not stand-alone software. (*Id*. at 3–4).

## Analysis

The dispute over these terms distills to two issues: first, whether the add-on necessarily runs within a software design tool, and second, whether the add-on can run independently from the software design tool. As to the first, the Court finds that the express claim language compels that the "add-on computer software code that runs . . . as an internal component within [a/the architectural] software design tool" necessarily runs within the software design tool. As to the second, the Court finds that although the add-on is not a stand-alone program, it is not necessarily tied to the software design tool and may run independently from the software design tool.

The add-on computer software code of the Asserted Patents adds functionality to a software application (the "parent application"), as distinct from software that offers the functionality standing alone but does not expand the functionality of the parent application. The Asserted Patents repeatedly distinguish the invention from the prior art on the grounds that the prior art disclosed stand-alone programs rather than "a plug-in (add-on) computer software code that runs as an internal component within a software design tool." *See, e.g.*, '523 Patent col.2 l.60 – col.3 l.2, col.4 ll.25–45, col.7 l.60 – col.8 l.2; '820 Patent col.2 ll.57–67, col.4 ll.27–47, col.8 ll.7–18. The add-on software enables operations within the software design tool. *See, e.g.*, '523 Patent col.7 ll.11–19 ("the methods and systems of the present invention perform one or more sets of operations in a software design tool, such as architectural CAD, using an add-on (plug-in) computer software program"); col.18 ll.3–11 ("the plug-in (add-on) computer software code also typically adds the following controls to the architectural CAD software: . . . [a] parametric symbol palette, which is added to the architectural CAD software palletes"). A key to the add-on is that it adds functionality to the parent application that would otherwise require separate

programs—it is not a stand-alone program. *See, e.g.*, '523 Patent col.6 l.59 – col.7 l.19 (contrasting performing operations in a first application and manually migrating the results of the operation to a second application with performing the operations in the second application that has been enhanced by the add-on); '820 Patent col.7 ll.4–32 (same). That is, the add-on "'adds-on' to the parent application." '523 Patent col.17 l.54 – col.18 l.11; '820 Patent col.61 l.42 – col.62 l.5.

In the Asserted Patents, "add-on" and, synonymously, "plug-in," are used according to their customary meaning in the art. For example, the *Microsoft Computer Dictionary* (5th ed. 2002) defines "add-on" as "[a] supplemental program that can extend the capabilities of an application program" and "plug-in" as "[a] small software program that plugs into a larger application to provide added functionality." (Dkt. No. 48-13 at 4–5). Similarly, the *Dictionary of Computer and Internet Terms* (8th ed. 2003) defines "plug-in" as "an accessory program that provides additional functions for a main application program." (Dkt. No. 48-12 at 4). And the "[p]lug-ins . . . show up as an option in an appropriate menu [of the main program]." (*Id.*).

Although the add-on extends the functionality of a parent application (e.g., software development tool), it is not necessarily restricted to a particular parent application. That is, an add-on may be able to run with more than one parent application. *See, e.g.*, '523 Patent col.11 ll.4–18 (noting that a commercial embodiment works with "AutoCAD, ArchiCAD and TurboCAD"); '820 Patent col.54 l.44 – col.55 l.23 ("one add-on computer code can be used in connection [with] multiple different CAD (or other software design tool) manufacturers, distributors and/or other individuals or entities, and with a wide variety of different CAD (or other software design tool) products"). Therefore the add-on can be said to run "independently" of one parent application when it runs with a different parent application. Further, there is

nothing in the patent that requires that an "add-on" not also be able to run independently of a parent application, so long as the "add-on" provides functions to and through a parent application. This independence does not conflict with the Asserted Patents' descriptions that the add-on is not stand-alone software—the stand-alone software disparaged in the patents is software that runs **only** independently of the software design tool—it is software that does not add on to the software design tool. And the extrinsic evidence of record indicates that an add-on "**usually** cannot be run independently." Wikipedia, "Add-on," available at https://en.wikipedia.org/wiki/Add-on, (Dkt. No. 48-11 at 2) (emphasis added). Thus, while it may be unusual for an add-on to run independently, the inability to run independently is not a necessary characteristic of an add-on.

The Court further understands that under the plain meaning of "runs . . . as an internal component within," an "add-on" that runs outside of a software design tool cannot be said to run "as an internal component within" the software design tool. The '820 Patent explicitly distinguishes add-on code that runs within a software design tool from add-on code the runs outside of a software design tool. '820 Patent col.61 ll.42–55 (providing two alternative add-ons, one the runs "within" and one that runs "outside"). But the Court declines to adopt Defendant's proposed construction that the add-on "runs within the same operating system process" as the software design tool because Defendant's proposed construction does not clarify the plain meaning of "runs . . . as an internal component within" the software design tool.

Accordingly, the Court rejects Defendant's "cannot be run independently" limitation and determines that these terms have their plain and ordinary meaning and need no further construction.

### B. "price schedule"

| Disputed Term | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "price schedule"<br><br>• '523 Patent Claims 45, 46<br>• '820 Patent Claims 1, 4, 7, 13, 16, 19 | Plain and ordinary meaning, an example of which is set forth in the patent specification for the '820 Patent. No construction necessary. | "spreadsheet, table, and/or the like that includes price data for each of one or a plurality of construction plan (or other) elements and/or parametric symbols, and optionally including selected characteristics corresponding with the various construction plan (or other) elements and/or parametric symbols" |

**The Parties' Positions**

Plaintiffs submit that the Asserted Patents provide examples of the plain and ordinary meaning of "price schedule." (Dkt. No. 44 at 18) (citing '523 Patent col.14 ll.45–49; '820 Patent col.38 ll.36–44). Plaintiffs argue that Defendant's proposed construction should be rejected because it is narrower than the provided examples. (*Id*. at 18–19). Specifically, Plaintiffs note that the Asserted Patents allow that a "price schedule" is "editable or non-editable" and that it may include "pricing data and/or other information that corresponds with one *or a plurality of construction plain (or other) elements*." (*Id*. at 19) (quoting '820 Patent col.38 ll.38–44 (emphasis added by Plaintiffs)).[6]

In addition to the claims themselves, Plaintiffs cite the following **intrinsic evidence** to support their position: '523 Patent col.14 ll.45–49; '820 Patent col.38 ll.36–44.

Defendant responds that the "price schedule" is not simply a statement of the total cost of elements in the construction plan, but is a listing of the pricing for individual elements in the

---

[6] In their P.R. 4-5(d) Joint Claim Construction Chart, the parties provide Defendant's proposed definition to include "a plurality of construction plan (or other) elements," which phrase was not present in Defendant's originally proposed construction. (Dkt. No. 48 at 20); (Dkt. No. 52-1 at 2).

plan. (Dkt. No. 48 at 20–22). Defendant argues that "price schedule" is defined and used in the Asserted Patents to denote a list of construction plan elements and their prices. (*Id*. at 20–21). Defendant further responds that its proposed definition allows that the price schedule is editable or non-editable. (*Id*. at 21).

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position. **Intrinsic evidence**: '523 Patent col.5 ll.25–29, col.14 ll.45–49, col.15 ll.51–53, col.23 ll.39–67, col.26 ll.44–52, fig.21; '820 Patent col.5 ll.27–32, col.38 ll.36–52, col.47 ll.26–29, col.72 ll.41–52, fig.21. **Extrinsic evidence**: Greenspun Decl. (Defendant's Ex. I, Dkt. No. 48-10).

Plaintiffs reply that Defendant's proposed construction improperly requires that the "price schedule" must include "a detailed list of the selected construction products with attached corresponding pricing to provide a total cost value therefore." (Dkt. No. 50 at 5–6) (quoting Defendant's response brief, Dkt. No. 48 at 20–21).

**Analysis**

It appears that the dispute over this term is whether a "price schedule" necessarily has separate pricing data for each element in the plan. The Court finds that as expressly defined in the Asserted Patents, a "price schedule" does not require a list with one-to-one correspondence between elements and their price.

"Price schedule" is defined in the Asserted Patents. The '523 Patent provides:

The phrase "price schedule" as used herein means a "parametric symbol schedule" that includes pricing data that corresponds with selected parametric symbols, and selected characteristics that correspond with the various parametric symbols selected.

'523 Patent col.14 ll.45–49. The patent further provides:

The phrase "parametric symbol schedule" as used herein means a schedule that includes selected parametric symbols, and selected characteristics that correspond

with the selected parametric symbols. It may or may not include price information for the selected parametric symbols.

*Id*. at col.14 ll.40–44. The '820 Patent provides a similar definition:

> The phrase "price schedule" as is used herein means an editable or non-editable schedule, spreadsheet, table and/or the like that includes pricing data and/or information that corresponds with one or a plurality of construction plan (or other) elements and/or parametric symbols, and one or a plurality of selected characteristics that correspond with the various construction plan (or other) elements and/or parametric symbols, such as height, width, color, quality and/or the like, as is discussed herein. The price schedule may optionally include statements, data, information, columns, rows, headings, letters, numbers, symbols and/or the like, and may be in any one of many different forms required or desired by a user or otherwise, as is known by those having ordinary skill in the art. No particular form or format is required. Other terms that may be used to refer to a "price schedule" include a "Bill of Materials" (BOM), "Take Off" and/or the like, which are included in this definition for "price schedule."

'820 Patent col.38 ll.36–52.

These express definitions make clear that the "price schedule" is a schedule listing price data the corresponds with one or more parametric symbols or construction plan (or other) elements.[7] That is, the "price schedule" may include price data that separately corresponds with each parametric symbol (or element) or it may include price data that collectively corresponds with a plurality of parametric symbols (or both). The "price schedule" does not require pricing data for each parametric symbol (or element) so long as it includes pricing data that corresponds with one or a plurality of symbols (or elements).

The Court discerns a meaningful difference between the '523 Patent's definition and the '820 Patent's definition. For example, the '523 Patent requires pricing data for parametric

---

[7] The Court understands that "construction plan (or other) elements" means that the elements may be elements of a plan other than a construction plan, such as elements of a mechanical or industrial engineering plan. *See, e.g.*, '820 Patent col.9 ll.23–40 (noting that pricing is provided for "construction (or other) elements that may be used in the set of construction, architectural, civil engineering, industrial engineering (or other) plans"); col.37 ll.15–30 (noting that a parametric symbol may represent an "architectural, mechanical, construction or electronic element").

symbols whereas the '820 Patent allows that a price schedule may not have pricing data for parametric symbols. While terms should be construed consistently across patents in a family when possible, the inventor's lexicography governs. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("we presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning"); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) ("the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs"). Accordingly, the Court construes "price schedule" differently for each Asserted Patent as follows:

- '523 Patent: "price schedule" means "schedule that includes selected parametric symbols, pricing data that corresponds with selected parametric symbols, and selected characteristics that correspond with the various parametric symbols selected";

- '820 Patent: "price schedule" means "editable or non-editable schedule, spreadsheet, table and/or the like that includes pricing data and/or information that corresponds with one or a plurality of construction plan (or other) elements and/or parametric symbols, and one or a plurality of selected characteristics that correspond with the various construction plan (or other) elements and/or parametric symbols."

### C.     "parametric symbol"

| Disputed Term | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "parametric symbol"<br><br>• '523 Patent Claims 45, 46<br>• '820 Patent Claims 2, 19 | Plain and ordinary meaning, an example of which is set forth in the patent specification for the '820 Patent. No construction necessary. | "2D or 3D representation of a common architectural, mechanical, construction, or electronic element that includes one or more parameters about its characteristics, which may be inserted as an object into an architectural drawing"<br><br>Alternatively, indefinite under 35 U.S.C. § 112, ¶ 2. |

### The Parties' Positions

Plaintiffs submit that the Asserted Patents provide examples of the plain and ordinary meaning of "parametric symbol." (Dkt. No. 44 at 19) (citing '523 Patent col.14 ll.15–23; '820 Patent col.37 ll.15–26). Plaintiffs argue that Defendant's proposed construction should be rejected because it improperly injects the limitation "which may be inserted as an object into an architectural drawing." (*Id*. at 20). According to Plaintiff, the Asserted Patents describe that, in an exemplary embodiment, a parametric symbol may be used to perform an action by inserting it as an object in an architectural drawing, but "parametric symbol" is not defined by this. (*Id*.). Plaintiffs further submit that the meaning of "parametric symbol" is sufficiently definite in light of the intrinsic record. (*Id*. at 20–22).

In addition to the claims themselves, Plaintiffs cite the following **intrinsic evidence** to support their position: '523 Patent col.14 ll.15–23, col.19 l.39 – col.20 l.3; '820 Patent col.37 ll.15–26, col.64 ll.22–62, figs. 4, 8, 9, 22.

Defendant responds that "parametric symbol" was defined in the asserted patents in a way that differs from its ordinary meaning. (Dkt. No. 48 at 22). According to Defendant, in the

context of parametric modelling, an approach to computer design of objects, a "parametric symbol" is "a component that maintains consistent relationships with other components as the model is manipulated." (*Id*. at 23). Defendant argues that the Asserted Patents expressly define "parametric symbol." (*Id.* at 23) ('523 Patent col.14 ll.15–26; '820 Patent col.37 ll.15–30). And, Defendant contends, this definition is different from the ordinary meaning of the term in that the "parametric symbol" of the Asserted Patents "does not require maintaining consistent relationships." (*Id*.). Defendant further responds that "parametric symbol" is defined and used in the Asserted Patents to denote a drawing, not simply a list, and the drawing is an object when inserted into a construction plan. (*Id*. at 24–25).

Defendant also responds that if "parametric symbol" is construed to encompass a "written list of construction plan elements" or a "representation that does not become an object when it is inserted into the construction plan drawing" then it renders claims indefinite as they require "a contradictory result—that the parametric symbols be 'insert[ed] . . into the construction plan drawing.'" (*Id*. at 25–26) (citing '523 Patent Claims 45–52; '820 Patent Claim 19; *Virtual Solutions, LLC v. Microsoft Corp.*, 925 F. Supp. 2d 550 (S.D.N.Y. 2013)).

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position. **Intrinsic evidence**: '523 Patent col.11 ll.38–39, col.14 ll.15–26, col.16 ll.54–64, fig.4; '820 Patent col.16 ll.8–9, col.16 ll.20–23, col.37 ll.15–30, col.60 ll.21–36, col.62 l.53, figs. 4, 8, 9, 22. **Extrinsic evidence**: Alan Freedman, *Computer Desktop Dictionary* (9th ed., 2001), "parametric modelling" (Defendant's Ex. Q, Dkt. No. 48-18); Autodesk, *About Creating a Schematic Symbol of a Parametric MvPart* (Feb. 11, 2016) (Defendant's Ex. R, Dkt. No. 48-19); Greenspun Decl. (Defendant's Ex. I, Dkt. No. 48-10).

Plaintiffs reply that Defendant's proposed construction is narrower than the meaning of the "parametric symbol" provided in the Asserted Patents. (Dkt. No. 50 at 6–7). Specifically, Plaintiffs contend that the meaning provided in the patents does not require that the parametric symbol "may be inserted as an object into an architectural drawing." (*Id*. at 7).

**<u>Analysis</u>**

The dispute over this term appears to be whether a "parametric symbol" is a drawing. The Court finds that it is.

"Parametric symbol" is defined in the Asserted Patents. The '523 Patent provides:

> The phrase "parametric symbol" as used herein means an architectural 2D or 3D drawing that is typically of a common architectural, mechanical, construction or electronic element, such as a window, an entry or interior door, an acrylic glass block, a sky light or the like, and that includes parameters about its characteristics, such as size, color, type of material (wood, vinyl, aluminum, etc.), presence or absence of grids, number of grids, type of glass, coating on the glass, presence or absence of breather tubes, and the like. Parametric symbols typically enable an architect, other designer and/or architectural CAD software to work with an object as a real-world entity, rather than just as lines and polygons.

'523 Patent col.14 ll.15–26. The '820 Patent provides:

> The phrases "parametric symbol" and "object" as are used herein mean a generic or manufacturer/distributor/other specific architectural, civil engineering, industrial engineering or other 2D or 3D drawing that is typically of a common architectural, mechanical, construction or electronic element, such as a window, an entry or interior door, an acrylic glass block, a sky light or the like, and that includes one or a plurality of parameters about its characteristics, such as size, color, type of material (wood, vinyl, aluminum, etc.), presence or absence of grids, number of grids, type of glass, coating on the glass, presence or absence of breather tubes, and/or the like. Parametric symbols typically enable an architect, civil or industrial engineer and/or other designer and/or architectural CAD software (or other software design tool) to work with an object as a real-world entity, rather than just as lines and polygons.

'820 Patent col.37 ll.15–30.

These express definitions make clear that the "parametric symbol" is a drawing of an element and contains parameters about the element's characteristics. But there is nothing in these

definitions requiring that a "parametric symbol" necessarily "may be inserted as an object into an architectural drawing," as Defendant proposes. The Asserted Patents do, however, indicate that a "parametric symbol becomes an object once the user attaches attributes to it and inserts it into the construction plan." '523 Patent col.16 ll.62–64; '820 Patent col.60 ll.34–36.

Accordingly, the Court construes "parametric symbol" as follows:

- "parametric symbol" means "2D or 3D drawing that is typically of a common architectural, mechanical, construction or electronic element and that includes one or more parameters about the element's characteristics."

**D.     "inserting the price schedule into the construction plan file"**

| Disputed Term | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "inserting the price schedule into the construction plan file"<br><br>• '820 Patent Claims 5, 13 | Plain and ordinary meaning. No construction necessary. | "imbedding a human-readable representation of the price schedule into the construction plan drawing" |

**<u>The Parties' Positions</u>**

Plaintiffs submit that the meaning of this term is readily understood in the context of the surrounding claim language, and therefore the term does not need to be construed. (Dkt. No. 44 at 23). Plaintiffs argue that Defendant's proposed construction should be rejected because it improperly imports "imbedding," "human-readable representation," and "drawing" limitations. (*Id*. at 23–25). Plaintiffs contend that imbedding is described in the Asserted Patents as an optional embodiment and, as such, is not appropriately read into the claims. (*Id*. at 23–24) (citing '820 Patent col.63 ll.22–29). Plaintiffs further contend that there is no intrinsic support for requiring the price schedule be inserted as a "human readable representation" and that such a

limitation injects ambiguity into the claims. (*Id*. at 24–25). And Plaintiffs contend that there is no intrinsic support for interpreting a "file" as a "drawing." (*Id*. at 25).

In addition to the claims themselves, Plaintiffs cite the following **intrinsic evidence** to support their position: '820 Patent col.63 ll.22–29.

Defendant responds that the Asserted Patents "consistently and exclusively discuss[] imbedding the price schedule into the construction plan drawing" and the claim term should be accorded that meaning. (Dkt. No. 48 at 26). Defendant argues that all descriptions of inserting a price schedule are limited to inserting the schedule "into the plan ***drawing*** (or the plan, generally)." (*Id*. at 27) (emphasis in original). And Defendant contends that there is no discussion in the intrinsic record regarding inserting a price schedule into a "software file that contains the construction plan drawing." (*Id*.). Rather, Defendant contends, that '820 Patent teaches the benefit of inserting the schedule into the plans themselves. (*Id*. at 27–28) (citing '820 Patent col.47 ll.17–26). Defendant further responds that term is properly construed as inserting the price schedule into the plan drawing because the '820 Patent states that the "***present invention*** is directed to an automated pricing system in which a price schedule for a construction product, such as a window, is optionally, but typically, generated and ***inserted directly into a set of construction project (or other architectural, civil, industrial or other) plans***." (*Id*. at 28–29) (quoting '820 Patent col.46 ll.16–24 (emphasis added by Defendant)). Defendant also contends that the "price schedule, as inserted into the construction plan drawing, is readable by a human— not just a machine—as intended by the patents." (*Id*. at 30 & n.14).

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position. **Intrinsic evidence**: '820 Patent [57] Abstract, col.5 ll.27–36, col.9 ll.50–54, col.10 ll.13–17, col.16 ll.16–19, col.32 ll.7–9, col.46 ll.16–24, col.47 ll.17–26,

col.57 ll.56–61, col.60 ll.31–41, col.63 ll.22–29, col.71 ll.30–56. **Extrinsic evidence**: 1st Pricing, Create/Insert a Schedule video, available at http://web.archive.org/web/20071010164018/ http://www.1stpricing.com/video/2-1.htm (Defendant's Ex. S, Dkt. No. 48-20); Greenspun Decl. (Defendant's Ex. I, Dkt. No. 48-10).

Plaintiffs reply that the term "construction plan file" is used in the claims to denote separate concepts—namely, "construction plan" and "file"—and is not synonymous with "construction plan drawing." (Dkt. No. 50 at 7). Similarly, Plaintiffs reply that the terms "construction plan" and "construction plan drawing" are not used synonymously in the Asserted Patents. (*Id*. at 8). Plaintiffs further reply that there is no intrinsic evidence establishing that the inserted price schedule must be a "human-readable representation" or that it must be "imbedded." (*Id*. at 8–9).

Plaintiffs cite further **intrinsic evidence** to support their position: '820 Patent col.71 ll.30–56.

### Analysis

There are three disputes with respect to this term. First, whether "inserting" means "imbedding." Second, whether "construction plan file" means "construction plan drawing." And third, whether by inserting a price schedule into a construction plan file the price schedule is necessarily rendered in a human-readable form. As to the first, the Court finds that while imbedding is inserting, inserting is not necessarily imbedding. As to the second and third, the Court finds that while inserting a price schedule in a human-readable form into a construction plan drawing is inserting a price schedule into a construction plan file, inserting a price schedule into a construction plan file does not necessarily require that the price schedule be rendered in human readable form in a drawing.

The Court does not understand "insert" to mean "imbed," as Defendant proposes. Even if the Asserted Patents "exclusively" discuss imbedding the price schedule, that is not enough to redefine "insert" as "imbed." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc) ("we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment"); *see also, Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that."). And the Asserted Patents note that the schedule may be inserted in other ways. For example, the patents provide that "the price schedule advantageously is inset directly into the building plans . . . so that the building plans themselves advantageously include . . . a final price schedule." '523 Patent col.15 ll.46–50 (emphasis added); *see also*, '820 Patent col.47 ll.13–26. That is, the advantage of inserting the price schedule into the plan is that the plan itself includes the price schedule, not that the price schedule is imbedded. Simply, there is insufficient evidence that the patentee redefined "insert" as "imbed."

Likewise, the Court does not understand "construction plan file" to mean "construction plan drawing." Even if the Asserted Patents exclusively discussed inserting price schedules into drawings, that is not enough to "redefine construction plan file" as "construction plan drawing." *See Phillips*, 415 F.3d at 1323; *Thorner,* 669 F.3d at 1366. Further, the Asserted Patent discuss inserting the price schedule into "plans," not just into "drawings." '523 Patent col.15 ll.46–50; '820 Patent col.47 ll.13–26. And the fact that the Asserted Patents separately use the terms "construction plans" and "construction plan drawings" implies that the terms are not strictly synonymous. *See, e.g.*, '820 Patent col.72 ll.26–29 (referring to the "drawing of the construction

plans"). Again, the advantage of inserting the price schedule into the plan is not that the price schedule is necessarily rendered in a drawing, it is that the plan includes the price schedule. *Id*. There is insufficient evidence that "construction plan file" is defined to mean "construction plan drawing" in the Asserted Patents.

Finally, Defendant has presented no evidence by which the Court can add a "human-readable" limitation to the claims.

Comporting with the plain meaning of the "inserting," the Asserted Patents distinguish between inserting a price schedule and exporting a price schedule as a standalone software file like an Excel spreadsheet. *See, e.g.*, '523 Patent col.15 ll.42–57 (noting that in addition to inserting the price schedule into the building plans, "[t]he price schedule can also be exported as a standalone object in the form of various common computer applications or formats including . . . Excel"); '820 Patent col.47 ll.13–32 (same). That is, a price schedule that is only exported as a standalone software file, such as an Excel file, cannot be said to be inserted into a construction plan file.

Accordingly, the Court rejects Defendant's proposed "imbedding," "human-readable representation," and "drawing" limitations and determines that the term has its plain and ordinary meaning and needs no further construction.

**"[may/can] be immediately used on the local computer to place an order to purchase one or more construction plan elements that are present in the price schedule"**

| Disputed Term | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "may be immediately used on the local computer to place an order to purchase one or more construction plan elements that are present in the price schedule"<br><br>• '523 Patent Claim 45 | Plain and ordinary meaning. No construction necessary. | "may/can be used on a user's computer to proceed right away to a check out process on a website to purchase one or more of the construction plan elements that are present in the price schedule" |
| "can be immediately used on the local computer to place an order to purchase one or more construction plan elements that are present in the price schedule"<br><br>• '523 Patent Claim 46 | | |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**<u>The Parties' Positions</u>**

Plaintiffs submit that this term should be accorded its plain and ordinary meaning, which is not limited to using the price schedule to "proceed right away to a check out process on a website." (Dkt. No. 44 at 26–27). Plaintiffs argue that while the '523 Patent discloses an embodiment where pricing information is located on a remote system such as a website, the claims are not limited to such an embodiment. (*Id*.).

In addition to the claims themselves, Plaintiffs cite the following **intrinsic evidence** to support their position: '523 Patent col.16 ll.36–42.

Defendant responds that the intrinsic record is "clear that the only thing the patentees 'invented' was placing construction plan elements, corresponding to parametric symbols inserted using the claimed add-on, into a single shopping cart on a single website that allows the user to purchase the elements right away in a single checkout process." (Dkt. No. 48 at 30–31). Defendant contends that the '523 Patent describes the purchasing process exclusively as a check out process on a website. (*Id*. at 31). Defendant further contends that the invention claimed in the '523 Patent is distinguished from the prior art that did not have "*a web site* that permit[s] a user to place an order to purchase one or more of the construction plan elements that are present in a price schedule." (*Id*.) (quoting '523 Patent col.5 ll.25–39 (emphasis added by Defendant)). According to Defendant, the claims mandate a single checkout process because they recite "place *an* order," meaning "place *a single* order." (*Id*.).

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position. **Intrinsic evidence**: '523 Patent col.5 ll.25–39, col.7 ll.27–36, col.13 ll.65–68, col.14 l.66 – col.15 l.67, col.28 l.40 – col.29 l.38, col.29 ll.48–50; '523 Patent File Wrapper Feb. 9, 2010 Amendment and Response (Defendant's Ex. H, Dkt. No. 48-9). **Extrinsic evidence**: 1st Pricing, BIM meets Supply Chain video, available at http://web.archive.org/web/20071010163943/http://www.1stpricing.com/video/2-4.htm (Defendant's Ex. C, Dkt. No. 48-4); Greenspun Decl. (Defendant's Ex. I, Dkt. No. 48-10).

Plaintiffs reply that Defendant's proposed construction improperly limits the term to the disclosed embodiment of a checkout process on a website. (Dkt. No. 50 at 9).

**Analysis**

The dispute over this term is whether the "purchase" of the limitation must proceed via the website embodiment described in the Asserted Patents. The Court does not understand the terms to implicitly include a website limitation.

The Court understands these terms, in the context of the claims, to denote a characteristic of the price schedule created by the add-on computer software code, namely, the listed prices are final and the elements can be immediately purchased at those prices because they are final. For example, the '523 Patent explains:

> The prices that are described herein are ***final prices that may be used to immediately purchase*** (***on line or otherwise***) one or more construction plan elements that are present in a construction plan, such as a window and/or door. The online 1stPricing or other designated web site very advantageously permits architects and other users to rapidly create a precise bill of materials with multiple brands, distributors, line item pricing and online purchasing.

'523 Patent col.28 ll.37–40 (emphasis added); *see also*, col.27 l.63 – col.28 l.8 (noting that a price in the schedule is a "buy-it-now" price, "a final price that the user can rely on," and is not an "estimate"). That is, the patent allows that the price schedule may be immediately used to purchase elements—***online or otherwise***—because the prices are finals, not estimates. Thus, the Court rejects Defendant's proposed "check out process on a website" limitation.

With respect to "immediately," the Court does not understand Defendant's proposed "right away" limitation to clarify the claims. And the Court notes that the Asserted Patents, in the context of purchasing an element, disclose that the term "immediately" encompasses "the same day" the price schedule is generated. '523 Patent col.6 ll.26–37 ("With the method and systems of the present invention, it is possible to obtain a price for a construction product. . . . Very advantageously, the construction product can be purchased the same day (i.e., immediately)."). Thus, the Court rejects Defendant's proposed "right away" limitation.

Accordingly, the Court rejects Defendant's "proceed right away to a check out process on a website" limitation and determines that the term has its plain and ordinary meaning and needs no further construction.

### F.    The Alleged 35 U.S.C. § 112, ¶ 6 Terms

| Disputed Term | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "using the add-on computer software code, creating a price schedule from the prices"<br><br>• '523 Patent Claim 45 | This term is not subject to 35 U.S.C. § 112 ¶6.<br><br>Plain and ordinary meaning. | Indefinite under 35 U.S.C. § 112, ¶ 6.<br><br>**Function**: creation/generation of a price schedule for a construction project<br><br>**Structure**: None disclosed. Indefinite. |
| "add-on computer software code . . . wherein execution of the add-on computer software code by the processor causes the computer to generate a price schedule for a construction plan file"<br><br>• '820 Patent Claims 1, 4, 7, 13, 16 | This term is not subject to 35 U.S.C. § 112 ¶6.<br><br>Plain and ordinary meaning. | Indefinite under 35 U.S.C. § 112, ¶ 6.<br><br>**Function**: creation/generation of a price schedule for a construction project<br><br>**Structure**: None disclosed. Indefinite. |
| "add-on computer software code . . . wherein the add-on computer software code when executed by the computer causes the computer to … generate a price schedule from the received pricing data"<br><br>• '820 Patent Claim 19 | This term is not subject to 35 U.S.C. § 112 ¶6.<br><br>Plain and ordinary meaning. | Indefinite under 35 U.S.C. § 112, ¶ 6.<br><br>**Function**: creation/generation of a price schedule for a construction project<br><br>**Structure**: None disclosed. Indefinite. |

| Disputed Term | Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "the add-on computer software code when executed by the local computer . . . generates a price schedule from the prices"<br><br>• '523 Patent Claim 46 | This term is not subject to 35 U.S.C. § 112 ¶6.<br><br>Plain and ordinary meaning. | Indefinite under 35 U.S.C. § 112, ¶ 6.<br><br>**Function**: creation/generation of a price schedule for a construction project<br><br>**Structure**: None disclosed. Indefinite. |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**<u>The Parties' Positions</u>**

Plaintiffs submit that the alleged means-plus-function terms are not governed by 35 U.S.C. § 112, ¶ 6 because: (1) they do not include the word "means" and are therefore presumptively not governed by § 112, ¶ 6 and (2) the phrase "add-on computer software code," in light of the intrinsic record, provides sufficiently definite structure such that the presumption against § 112, ¶ 6 is not overcome. (Dkt. No. 44 at 28–32) (collecting cases in which "software," "code," and similar terms were found sufficiently structural to avoid § 112, ¶ 6).

Defendant responds that the terms are governed by § 112, ¶ 6 because the "add-on" that performs the recited functions does not "have a sufficiently definite meaning as a name for structure." (Dkt. No. 48 at 33–40) (quoting *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (en banc in relevant part) and collecting cases in which "computer application" and "computer" terms were found to not be sufficiently structural to avoid § 112, ¶ 6). Defendant further responds that the Asserted Patents fail to disclose the structure corresponding to the recited function in that they fail to disclose an algorithm for

creating/generating the price schedule. (*Id.* at 36–38). Thus, Defendant concludes, the terms fail to comply with § 112, ¶ 6 and the claims are indefinite. (*Id.* at 38).

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position. **Intrinsic evidence**: '523 Patent col.15 ll.14–67, col.28 ll.13–44, col.29 l.47 – col.31 l.5; '820 Patent col.54 ll.31–35, col.58 ll.46–47, col.61 ll.48–49, col.74 l.47 – col.75 l.21, col.76 l.34 – col.77 l.67. **Extrinsic evidence**: Wikipedia, "Add-on," available at https://en.wikipedia.org/wiki/Add-on (Defendant's Ex. J, Dkt. No. 48-11); Greenspun Decl. (Defendant's Ex. I, Dkt. No. 48-10).

Plaintiffs reply that the claims need not disclose an algorithm to avoid invoking § 112, ¶ 6 and that "add-on computer software code" is sufficiently structural to avoid § 112, ¶ 6. (Dkt. No. 50 at 10–11).

**<u>Analysis</u>**

The disputes over these terms are whether 35 U.S.C. § 112, ¶ 6 governs and, if so, whether the Asserted Patents disclose adequate structure for performing the claimed function. Because the Court determines that the terms are not governed by § 112, ¶ 6, it does not reach the issue of whether the Asserted Patents disclose the structure required by § 112, ¶ 6.

None of these terms include the "means" language. Therefore, the Court presumes that § 112, ¶ 6 does not apply. *Williamson v. Citrix Online*, LLC, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in relevant portion). "[T]he presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1349 (quotation marks omitted). Here, Defendant has not overcome the presumption.

First, Claim 45 of the '523 Patent is a method claim and Defendant has not presented any argument or evidence that "creating a price schedule from the prices" is a step-plus-function limitation. Instead, Defendant presents this as a means-plus-function limitation, erroneously looks for corresponding structure, and erroneously applies *Williamson. See* 792 F.3d 1339, 1349 (Fed. Cir. 2015) (en banc in relevant portion) (distinguishing application of § 112, ¶ 6 to method claims from application of § 112, ¶ 6 to apparatus claims). As such, Defendant necessarily fails to overcome the presumption that § 112, ¶ 6 does not apply. *See Masco Corp. v. United States*, 303 F.3d 1316, 1326–27 (Fed. Cir. 2002) (noting the language used to presumptively invoke § 112, ¶ 6 in a method claim is "step for").

Second, with respect to the alleged means-plus-function limitations in the apparatus claims, Defendant fails to overcome the presumption because it has not established that the "add-on computer software code" is not sufficiently structural. The claims connote that the "add-on computer software code" is structural by describing how the "add-on computer software code" operates within the claimed invention to achieve its objectives. For instance, Claim 46 of the

'523 Patent

**46**. An automated system for creating a price schedule for one or more construction plan elements of a construction project comprising:
  (a) a local computer;
  (b) an architectural software design tool, wherein the architectural software design tool provides on the local computer a construction plan drawing having at least one construction plan element;
  (c) one or more databases including pricing data for the construction plan elements;
  (d) an add-on computer software code that runs as an internal component within the architectural software design tool on the local computer;
wherein the add-on computer software code has a palette that includes at least one parametric symbol that corresponds with a construction plan element, and that may be selected by a user for insertion into the construction plan drawing; and
wherein the add-on computer software code when executed by the local computer:
  (i) inserts at least one of the parametric symbols that are selected by a user into the construction plan drawing;
  (ii) transmits data corresponding to inserted parametric symbols from the local computer to the database;
  (iii) receives from the database a price for the purchase of one or more construction plan elements corresponding to inserted parametric symbols, wherein the price may be determined using price data that is present in the database; and
  (iv) generates a price schedule from the prices, wherein the price schedule may include a total cost for all of the construction plan elements corresponding to inserted parametric symbols, wherein the price schedule can include one or more construction plan elements, and wherein the price schedule can be immediately used on the local computer to place an order to purchase one or more construction plan elements that are present in the price schedule.

'523 Patent, reproduced here, recites that the add-on computer software code runs within the software design tool, inserts specific symbols into a drawing provided by the software design tool, transmits specific symbol data from the local computer to the pricing-data database, receives specific pricing data based on the symbols from the database, and generates a specific pricing schedule using the received pricing data. That is, the claim itself connotes the structural nature of the "add-on computer software code" by describing how the add-on computer software code operates within the claimed invention.

Such a disclosure of the objectives of the "add-on computer software code," and how the code operates within the context of the claimed invention, connotes sufficiently definite structure to one of skill in the art. *See, e.g.*, *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1319–21 (Fed. Cir. 2004) ("circuit [for performing a function]" found to be sufficiently definite structure because the claim recited the "objectives and operations" of the circuit); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1295, 1301 (Fed. Cir. 2014) ("heuristic [for performing a function]" found to be sufficiently definite structure because the patent described the operation and objectives of the heuristic); *Collaborative Agreements, LLC v. Adobe Sys.*, No. 15-cv-03853-EMC, 2015 U.S. Dist. LEXIS 161809, at *11–*24 (N.D. Cal. Dec. 2, 2015) ("code segment [for performing a function]" found to be sufficiently definite structure because the claim described the operation of the code segment); *Finjan, Inc. v. Proofpoint, Inc.*, No. 13-cv-05808-HSG, 2015 U.S. Dist. LEXIS 162504, at *31–*32 (N.D. Cal. Dec. 3, 2015) ("processor [for performing a function]" found to be sufficiently definite structure because the claim described how the processor functions with the other claim components); *SuperSpeed, LLC v. Google, Inc.*, No. H-12-1688, 2014 U.S. Dist. LEXIS 4479, at *78–*79 (S.D. Tex. Jan. 14, 2014) ("code [for

performing a function]" found to be sufficiently definite structure because the claim describes the operation of the code within the invention).

Accordingly, the Court determines that these terms are not governed by 35 U.S.C. § 112, ¶ 6 and need no further construction.

## V.     CONCLUSION

The Court adopts the above constructions set forth in this opinion for the disputed and agreed terms of the Asserted Patents. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 7th day of July, 2016.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE